Grafton,
Oct. 3, 1911.

### McBride v. Huckins & a.

A practitioner of medicine and surgery is bound to possess and exercise that degree of skill which is ordinarily possessed and exercised by those engaged in the practice of the same profession in similar localities.

The erroneous exclusion of a requested instruction is presumed to be harmful, unless the record discloses some fact clearly indicating that the excepting party was not prejudiced by the ruling.

Where the declaration in an action against a physician for malpractice contains a count in trespass, and an erroneous theory of liability adopted at the trial may have been considered by the jury on either ground as having some tendency to enhance the damages, their finding upon the latter issue must be set aside, as well as the verdict upon the question of liability.

CASE, against the defendants as surgeons, for negligently amputating the plaintiff's arm which had been injured and required surgical attention. There was also a count for trespass or assault. Trial by jury and verdict for the plaintiff. Transferred from the September term, 1909, of the superior court by *Chamberlin*, J., on the defendants' exception to the refusal of the court to instruct the jury as follows: "If you find that the defendants possessed such skill and learning as is ordinarily possessed by physicians practicing in the same line in similar localities, and that in treating and diagnosing the plaintiff's case they used ordinary care in exercising such learning and skill, notwithstanding you find that the arm might have been saved, your verdict should be for the defendants." The court instructed the jury that the degree of skill required of the defendants is such as is ordinarily possessed by the profession.

*Alvin F. Wentworth* and *Martin & Howe* (*Mr. Howe* orally), for the plaintiff.

*Sullivan & Daley* and *Burritt H. Hinman* (*Mr. Hinman* orally), for the defendants.

WALKER, J. The jury were instructed, in substance, that the defendants were bound, under their contract of employment, to possess that degree of skill in surgery in the treatment of the plaintiff's injured arm which is ordinarily possessed by those engaged in the same profession. The skill of the average physician and surgeon

was made the standard or test by which the jury were to determine the material question, whether the defendants had the knowledge, experience, and skill which the law requires a person to have, who represents himself to be a qualified surgeon and assumes upon request to render surgical assistance in a particular case.

The requested instruction, which was denied subject to the defendants' exception, made the necessary degree of skill of the defendants to depend upon the average or ordinary skill of physicians practicing in localities similar to Plymouth and Ashland, where the defendants lived and practiced their profession. Under the charge as given, the rule which the jury were required to apply was that the defendants must have the average skill of the profession generally, without limitations as to locality, while the rule contained in the request was that the defendants' competency as surgeons is to be determined by the average skill of practicing physicians or surgeons in similar localities. Although the word "physicians" is alone used in the request, it is evident that it was intended to include those members of the profession who practice surgery in connection with the general treatment of diseases; and the request limits the inquiry to surgeons or physicians whose practice includes cases requiring surgical attention, like the plaintiff's. "Practicing in the same line in similar localities" means, as applied to this case, the practice of surgery in country towns whose general characteristics, as to location, size, industries, and population, are substantially similar to those where the defendants assume to practice. The phraseology of the request, though open to some verbal criticism, is not so obscure or ambiguous as to mislead the jury, when considered in connection with the evidence and the circumstances disclosed by the case.

The question raised by the exception is not a merely fanciful or academic one. Expert proficiency in performing difficult surgical operations is not ordinarily possessed by the country doctor, for the reason that such cases do not often occur in his practice. His opportunities for experience and observation are much more limited than those of physicians and surgeons practicing in large cities where surgical operations are of frequent occurrence. While his professional education and knowledge of the books may be extensive, he is necessarily deficient in that expert skill which can only result from practical experience. Devoting himself to the ordinary practice of a rural community, he is necessarily deprived of that acquired skill which he might have attained if he had practiced his profes-

sion in a large and densely populated community. The degree of skill, therefore, which he can reasonably be assumed to possess, as a general rule, must be measured and determined by a due consideration of the limited opportunities afforded in the same or similar communities, and not by the greater and dissimilar opportunities existing in larger and different communities. It would be unjust to hold him to that degree of professional ability which his environment prevents him from possessing.

On the other hand, it would be equally unjust to the plaintiff in a malpractice case to permit the jury to measure the defendant's skill by the average of professional ability found to exist in other communities affording less opportunity for practice in a given medical line than the defendant's locality affords. As in the former case the standard is too high, in the latter it would be too low. In neither case would it work out substantial justice.

It may be claimed that all inequality is avoided by adopting the rule announced by the court in the charge: that the defendants are bound to possess "that reasonable degree of learning, skill, and experience which is ordinarily possessed by those engaged in the same business or profession," or that "the duty which the law imposed upon them was that they did possess the learning, skill, and experience of the average physician and surgeon engaged in the profession of surgeons." But it is apparent that upon principle this is an unsatisfactory and impracticable test. It restricts the jury to no locality in the attempt to find the average skill of the profession in surgery. It is impracticable because of the difficulty, not to say impossibility, of determining the average skill of the medical profession as a body in the treatment of a given case. In view of the facts that different schools of medicine often employ radically different methods of treating the same disease, that the practice followed in one school would often be strong evidence of negligence if resorted to by a member of another school (*Spead* v. *Tomlinson*, 73 N. H. 46, 51), and that practitioners in one locality have opportunities for experience in treating certain diseases and bodily injuries which are almost entirely wanting in other localities, the extreme difficulty of ascertaining the average skill possessed by all physicians is apparent. Such a rule is unlimited, and, because it is unlimited, it is too indefinite to be of any real service to the jury in ascertaining whether a defendant possesses the average skill required. The field of inquiry must be restricted. Some reasonable territorial limit must be recognized, if the law is to furnish a rule that is just to the parties

and useful to the triers of the fact.   As no limit was prescribed, the instruction given by the court was of little assistance to the jury, and was as liable to result in their finding a standard that is clearly too high as in one that is too low.   The logical result is perhaps the same as it would be if no instruction upon the point were given.

But if they are instructed, that the average skill and ability of surgeons in active practice in communities affording opportunities for professional observation and experience of a character similar to those afforded by the town or district where the defendant practices his profession, is the standard, it is apparent that justice to both parties under their contract will be secured.   The implied agreement of the surgeon is that his surgical knowledge and experience is at least equal to that of the average surgeon practicing in the same or similar localities—not to that of the average of surgeons practicing in dissimilar localities.   It must be assumed that the parties had this distinction in mind; and it must also be assumed in any reasonable construction of their contract that they did not have in mind a general average of professional ability, in regard to which neither could have had any definite information.   They did not make a contract, a material part of which neither contemplated or understood, and which it would be impractical for a jury to apply. "Such a finding would be contrary to what the evidence shows the parties understood, or could understand, at the time of entering into the contract; and the law will not imply an undertaking which a jury could not reasonably find from the evidence." Spead v. Tomlinson, 73 N. H. 46, 52.

In Leighton v. Sargent, 27 N. H. 460, the question of the legal qualifications of a surgeon in a suit against him for malpractice was carefully considered, and it was decided (p. 469) that he agrees "that he possesses that reasonable degree of learning, skill, and experience which is ordinarily possessed by the professors of the same art or science, and which is ordinarily regarded by the community, and by those conversant with that employment, as necessary and sufficient to qualify him to engage in such business."   Upon the subsequent transfer of the case after a second trial, the court say (31 N. H. 119, 132): "One important question involved in the trial related to the degree of skill possessed by the defendant as a surgeon. The fact essential to be proved was that he was as skillful as surgeons generally in the section of the country in which he practiced, or, in other language, that his skill was equal to the ordinary skill of the members of the profession in practice."   The locality doctrine

was here expressly recognized and enforced. There is no intimation that the average skill of the entire profession of the state or country was regarded as the test. The professional ability referred to was the ability ordinarily found to exist among physicians and surgeons "in the section of the country in which" the defendant practiced.

It is probably true that in some cases this rule literally applied might restrict the inquiry to a too narrow territory. The defendant's actual practice might be confined to a single town where no other physician practiced, and in such a case necessarily no comparison could be made. He alone would furnish the test of his own skill—an evident absurdity. "It seems to us that physicians or surgeons practicing in small towns, or rural or sparsely populated districts, are bound to possess and exercise at least the average degree of skill possessed and exercised by the profession in such localities generally. It will not do, as we think, to say that if a surgeon or physician has exercised such a degree of skill as is exercised in the particular locality in which he practices, it will be sufficient." *Gramm* v. *Boener*, 56 Ind. 497, 501. For similar reasons a similar rule is followed in numerous cases. *Trembley* v. *Kimball*, (Me.) 77 Atl. Rep. 405; *Hathorn* v. *Richmond*, 48 Vt. 557; *Willard* v. *Norcross*, 81 Vt. 293; *Small* v. *Howard*, 128 Mass. 131; *Bigney* v. *Fisher*, 26 R. I. 402; *Lawson* v. *Conaway*, 37 W. Va. 159; *Thomas* v. *Dabblemont*, 31 Ind. App. 146; *Hitchcock* v. *Burgett*, 38 Mich. 501, 512; *Pelky* v. *Palmer*, 109 Mich. 561; *Whitesell* v. *Hill*, 101 Ia. 629; *Dunbauld* v. *Thompson*, 109 Ia. 199, 203; *Burk* v. *Foster*, 114 Ky. 20; *Dorris* v. *Warford*, 124 Ky. 768; Stew. Leg. Med., s. 87; 1 Wit. & Beck Med. Jur. 79. There are other cases that seem to confine the rule as to comparative skill to the vicinity in which the defendant practiced (*Pike* v. *Honsinger*, 155 N. Y. 201; *Gates* v. *Fleischer*, 67 Wis. 504), but it is probable that the distinction above discussed was not pressed by counsel and may not have been considered. In fact, in some cases the distinction might be of little or no use, as where the defendant resides in a city where presumably there are many other practicing physicians (*Pelky* v. *Palmer*, *supra*), but its general validity and usefulness is apparent both upon principle and authority.

The foregoing authorities, of course, fortify and establish the principle that a country physician is not bound as a matter of law to possess the professional qualifications found by taking the general average of skill of the entire profession. In *McCandless* v. *McWha*,

22 Pa. St. 261, which is often referred to in the books, the question under the charge was in effect whether a physician warrants a cure, and it was held that he is only bound to use "reasonable skill and diligence, . . . such as thoroughly educated surgeons ordinarily employ" (p. 268). While the language of the opinion might involve a comparison of the skill of the entire profession, that point was not discussed and the case cannot be regarded as a clear decision upon it.

It is argued in behalf of the plaintiff that it does not appear whether the average skill of the profession as a body is higher than that of physicians practicing in localities similar to Plymouth and Ashland, and that in the absence of such a finding it cannot be said that the defendants were harmed by the exclusion of the requested instruction. On the other hand, there is nothing in the case to indicate that it is lower. The court cannot take judicial notice of the fact and declare it to be one way or the other. If the requested instruction ought to have been given as a proposition of law, the fact that it was not given authorizes the presumption that the error was not merely harmless, unless the case discloses some fact clearly indicating that the defendants were not prejudiced by it. Having succeeded in showing that error was committed by the ruling of the court, which upon one view of the case may have misled the jury, the defendants were not obliged to go further and show as a matter of fact that it did them substantial harm. Under our system of jurisprudence, the presumption is that it did have that effect. Moreover, the plaintiff's position upon this point is inconsistent with his theory, that upon the evidence in the case the jury could properly find that the average of surgical ability in the profession as a body was higher than that possessed by the defendants. The verdict was based upon this proposition. But if the jury were authorized to find that fact, either from evidence given upon the stand or from their general knowledge or understanding of the profession as a whole, it necessarily follows that the same information would enable them to determine whether physicians in communities like Plymouth and Ashland had a greater degree of skill than physicians generally, or a less degree. The fact is that such a finding depends largely upon the judgment of the jury, based upon their general knowledge of matters of general notoriety and repute in the vicinage from which they come. It is not true, even in theory, that a juryman's mind is an absolute blank with reference to all material matters that arise

in the course of a trial.  4 Wig. Ev., *s.* 2570; Thayer Prelim. Ev. 296–298.

The argument that the word "physicians" as used in the request is too indefinite and might include quacks, empirics, and impostors, whose evident incompetence would lower the standard sought, might have some legitimate bearing if it were found that the jury would probably give that word such an unreasonable meaning. But the phrase "physicians practicing" in a community evidently means, in this connection, physicians whose learning, experience, and practice in that community entitle them to public confidence.   It does not mean all persons who assume to treat diseases or personal injuries, but only such as are ordinarily recognized as reputable physicians.  *Lawson* v. *Conaway*, 37 W. Va. 159, 163.

It is further insisted that if the request stated the correct rule, the defendants are precluded from taking advantage of the erroneous ruling because one of the issues raised by the plea was whether the defendants possessed "the ordinary skill of persons of said profession."   The language quoted is from the declaration, and the plea is the general issue.   But it is apparent that the trial was conducted throughout upon the ground that the defendants were only bound to possess the degree of skill required by law.   And the practical interpretation put upon the declaration in this respect by the court and the parties cannot be disregarded, and the professional qualifications of the defendants be determined by a technicality which substitutes error for law, because possibly the declaration, to which the defendants did not demur, stated the liability too broadly. The declaration was a general statement of facts from which it was claimed the defendants' liability legally resulted.   It was not intended to contain exact statements of legal principles.   The verdict must be set aside.

*Exception sustained.*

All concurred.

Upon the filing of the foregoing opinion, the plaintiff moved for a rehearing upon the question of liability, which was denied; but upon the question whether there should be a new trial as to the damages, further argument was invited.   After such argument the following opinion was rendered.

*Alvin F. Wentworth* and *Martin & Howe* (*Mr. Howe* orally), for the plaintiff.

*Sullivan & Daley* and *Burritt H. Hinman* (*Mr. Hinman* orally), for the defendants.

WALKER, J. It is impossible to determine on which count of the declaration the damages were assessed, or whether both causes of action were considered by the jury in deciding upon the amount of their verdict. *Peabody* v. *Kinsley*, 40 N. H. 416. If the erroneous theory of liability adopted at the trial may have been considered by the jury on either count, as having some tendency to enhance the damages, their finding in that respect must be set aside, as well as their finding on the issue of liability. While it is true that when the error found to exist in a trial does not apply to or affect all the issues covered by the verdict, a new trial of the entire case is not ordinarily ordered, but only so much of it is set aside as the error related to (*Lisbon* v. *Lyman*, 49 N. H. 553; *Genest* v. *Company*, 75 N. H. 365; *Piper* v. *Railroad*, 75 N. H. 435), it must clearly appear that the effect of the error did not extend to all the issues tried. If the error ostensibly relates to the question of liability, it may still be of such a character as to have had a prejudicial effect on the jury's assessment of damages. If, for instance, it should be erroneously ruled in an action for negligence that the defendant's previous conviction for theft might be considered on the question of liability, it would require little argument to show that it probably had a very prejudicial effect upon the jury's assessment of damages. While not technically relevant to that question or legally relevant to any question in the case, it could not be said, in the absence of specific instructions not to consider it, that the jury did not make it a substantial element of the damages awarded. It would therefore vitiate the entire verdict.

There were two counts in the declaration—one for negligence or malpractice and one for an assault. The evidence tended to show that the plaintiff received a severe injury to his arm, and requested the defendants to examine it and do what was necessary to save the arm, but not to amputate it. He was put under the influence of an anæsthetic, and the defendants upon examining the wound, in disregard of the plaintiff's instruction, amputated the arm. There was a general verdict for the plaintiff, and upon the defendants' exception to the charge of the court to the jury the exception was sustained. It was held in the former opinion that the court erred in instructing the jury that the law imposed upon the defendants the degree of skill possessed by surgeons generally, instead of that possessed by physicians and surgeons whose practice is confined to lo-

calities similar in general characteristics to the localities in which the defendants practiced.    They were charged with a higher degree of skill than the law requires, and because of that fact the jury may have found they were liable under the first count for malpractice.    The question now presented is whether the jury might not also have considered that fact in deciding upon the amount of the damages.

Under the count for malpractice, the jury may have found that, although the defendants had no authority from the plaintiff to amputate his arm, they were negligent in doing what they assumed to do.    They assumed to act as surgeons having full authority, and consequently to exercise the professional skill which the law imposes upon surgeons under such circumstances.    They were chargeable with the performance of a surgeon's duty when they undertook a surgeon's task.    *Pittsfield etc. Co.* v. *Shoe Co.*, 71 N. H. 522, 533. If they did not have the requisite skill for the performance of that duty, as the jury may have found, and injury resulted to the plaintiff, the question of their liability would be determined against them; but the question of damages would remain.    If it is true that in an action for negligence it is immaterial on the question of liability whether the defendant acted willfully in doing the act complained of, the circumstances attending the act, including the motives of the defendant, may often be considered in assessing the damages. "In civil trespasses, the law considers the damage actually inflicted upon the party wronged, rather than the intent or malice of him who is the wrongdoer, though the *quo animo* is sometimes shown, as material in aggravation of damages."    *Cate* v. *Cate*, 44 N. H. 211, 214; *Holyoke* v. *Railway*, 48 N. H. 541, 545; *Brown* v. *Collins*, 53 N. H. 442.

In *Bixby* v. *Dunlap*, 56 N. H. 456, it was held that ordinarily, in actions for torts, the rule of damages is compensation in money for the money value of such damage as would naturally and reasonably be expected to happen to the plaintiff by reason of the wrongful act; but that when the element of malice enters into the wrong a more liberal rule of damages prevails, and the jury, taking into consideration all the circumstances of the wrong, ought to give as compensation what in their judgment it is reasonable that the plaintiff should receive and the defendant pay.    This was merely an application of the doctrine announced after much investigation in *Fay* v. *Parker*, 53 N. H. 342, which has since been followed in this jurisdiction.    *Barnes* v. *Campbell*, 60 N. H. 27; *Kimball* v. *Holmes*, 60 N. H. 163; *Felch* v. *Railroad*, 66 N. H. 318, 320; *Friel* v. *Plumer*, 69 N. H.

498; *Cooper* v. *Hopkins*, 70 N. H. 271; *Cohn* v. *Saidel*, 71 N. H. 558, 566, 572; *Prescott* v. *Robinson*, 74 N. H. 460, 465.

Whether the use of the word "malice" in this connection is not unfortunate, and whether generically it is not too narrow to express the meaning intended, it is unnecessary to inquire, since it undoubtedly includes a willful invasion of the admitted rights of others with reference to person or property.   If the jury found, as they might have done in this case, that the defendants deliberately and intentionally disregarded the unequivocal instruction of the plaintiff not to amputate his arm but merely to make an examination of it and dress the wound, while he was unconscious, it could not be doubted that they acted maliciously.   Amputating the arm under such circumstances might show a wanton and contemptuous disregard and abuse of the professional confidence which the plaintiff reposed in the defendants.   It would be a material circumstance characterizing their act; and upon the authorities cited and upon principle it might have an important bearing upon the amount of damages the plaintiff ought to receive and the defendants ought to pay.

If in connection with, or in addition to, this element of damage, the jury believed that the defendants did not have the skill imposed upon them by the law and that they knew they were incompetent to do what they wrongfully assumed to do,—that is, to decide whether amputation was necessary and whether they should perform the operation,—it cannot be doubted that the amount of the verdict would be materially increased thereby.   It is also evident that the degree of skill thus considered by the jury in determining the competency of the defendants would be important. If the law required them to have and exercise the skill of the best surgeons and they had only the skill of country physicians, the jury might be convinced that they acted maliciously or wantonly in assuming to undertake to diagnose the case with reference to the necessity of amputation.   It would be a willful breach of their duty to the plaintiff, which would authorize the jury to apply what is called a liberal rule of damages.   Even if they were guilty of no excess of authority, their attempt to do what they knew they were not qualified to do would furnish ground for the application of that rule of damages, especially if, as was evidently found by the jury, the plaintiff's arm might have been saved by the degree of skill announced in the charge.   The erroneous standard of skill by which the jury were guided may have had in their minds a material bearing

upon the question of damages; and as it was higher than the law requires, its obvious tendency was to increase the amount of the verdict. If the defendants, falsely representing themselves to the plaintiff to be competent surgeons, unnecessarily cut off his arm, the fact of their incompetency which the plaintiff sought to guard against might cause very deep regret in his mind, for which he ought to receive compensation and for which the defendants ought to make amends. The charge of the court in regard to damages was very brief and did not exclude from the consideration of the jury this element of compensation; so that the presumption is at least that the jury considered all the legal elements of damage that might have been specifically submitted to them under the theory of liability adopted at the trial; and one of those elements was the defendants' want of skill.

*Motion for rehearing denied.*

YOUNG, J., dissented: the others concurred.